STATE OF CONNECTICUT *v.* ANGELO DUKES
(13246)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued February 10—decision released September 6, 1988

*Gary J. White,* assistant public defender, for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom were *John J. Kelly,* chief state's attorney, and, on the brief, *Roseann Wagner,* deputy assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to a jury, the defendant, Angelo Dukes, was convicted of the crimes of possessing narcotics with intent to sell in violation of General Statutes § 21a-277 (a)[1] and possession of a weapon in a motor vehicle in violation of General Statutes § 29-38.[2] He received a total effective sentence of ten years to be suspended after seven years with three years probation. This appeal followed.

[1] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marihuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned."

[2] General Statutes § 29-38 provides: "Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon,' as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles, stilletto, any knife, the edged portion of the blade of which is four inches or over in length or any martial arts weapon as defined in section 53a-3. The provisions of this section shall not apply to any person enrolled in and currently attending a martial arts school, with official verification of such enrollment and attendance, having any martial arts weapon including, but not limited to, nunchaku and Chinese stars in a vehicle while traveling to and from such school."

On appeal, the defendant claims that the trial court violated the constitution of Connecticut, article first, § 7,[3] in denying his motion to suppress certain evidence taken from his person and the motor vehicle that he was operating at the time of his arrest.[4] In doing so, he argues that his Connecticut constitutional protection against unreasonable searches and seizures was violated because the scope of the search that followed his being stopped on Interstate 95 for motor vehicle charges was improper. We find no error.

The following circumstances serve as the factual backdrop for the search and seizure involved. At approximately 6:20 a.m. on June 17, 1986, a Connecticut state police sergeant stopped a Buick automobile bearing New York license plates as it traveled north on the Connecticut Turnpike in Norwalk. He did so because he had clocked the Buick's speed at eighty-five miles per hour in a fifty-five mile per hour zone. When the officer pulled the Buick over and parked behind it, the defendant, who had been operating the Buick, got out of his car and started walking toward the officer's cruiser. The defendant was ordered to get back into his car and he complied. The officer exited his cruiser, walked up to the driver's side of the Buick and asked the defendant for his driver's license, registration and insurance identification card. He noted the presence of a passenger, later identified as John Antone, seated next to the defendant. From his vantage point, the officer saw two New York license plates on the floor behind

[3] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[4] The defendant's motion to suppress, as filed in the trial court, claimed violations of both the United States and Connecticut constitutions. In the trial court, as in this court, however, his claim of error is based solely on Connecticut constitutional grounds.

the driver's seat, which appeared "unusual" to him. He also saw a sticker "similar to a bumper sticker" affixed to the dashboard in front of the passenger's seat, which related: "This car insured by Smith and Wesson." This indicated to him "a strong possibility of the presence of a handgun" because he knew that Smith and Wesson was a manufacturer of guns, "particularly handguns." In addition, he observed that "during the whole time" the defendant and Antone were "very nervous, visibly shaking . . . [t]heir hands were shaking and [they] appeared to be in some panic of some sort."

The officer, having obtained the documents that he had requested from the driver, went back to his vehicle and, using his radio, requested a wanted person and driver's license suspension check from the desk officer at the police barracks. Within moments, the desk officer reported that the defendant's driver's license in New York was then under suspension, as was his right to drive in Connecticut. Thereupon, the officer went to the driver's side of the defendant's car, opened the door, told the defendant that he was under arrest for driving under suspension and for speeding. He told the defendant to get out of his vehicle and the defendant did so.

Once the defendant was out of the Buick, the officer immediately conducted a search of his clothing, "starting with the outer clothing and working [his] way into the pockets," as he normally did in a custodial arrest. He "[patted] the clothing down for anything that [was] bulky and obvious and [proceeded] further going into pockets and such"; he felt nothing that was "bulky and obvious." In the defendant's jacket pocket he found a small plastic vial that contained a form of cocaine called "crack," a burnt hand-rolled cigarette butt, a glassine package of white powder, an aluminum foil packet and two small straws with residue inside. The defendant

was thereupon handcuffed, brought back to the officer's cruiser and secured inside it with the officer's belt. The officer requested a back-up trooper.

When the back-up trooper arrived, the first officer asked the passenger Antone to exit the Buick. A pat-down search of Antone did not disclose any weapons or any of the items eventually seized. The "pat-down" search of Antone was not a "pat-down" search in the sense of the search of the defendant's person, which was a "full search of the [defendant's] pockets and his clothing . . . ." The officer's distinction was that the defendant was in custody and Antone was not.[5] The officer said that the intensity of his search "depends [on] whether there's a back-up there who can keep an eye on the person while [I'm] doing something else. If [I'm] the only one then it's going to be a very thorough pat-down and if he's got a lot bulkier clothing on [I'm] going to go a little bit further." He felt that "it's necessary to protect [himself] to do a pat-down search."

With Antone standing off to the side of the highway with the back-up officer there, the arresting officer proceeded to search "the passenger compartment of the [Buick] vehicle."[6] The fact that he had seen the Smith and Wesson sticker on the dashboard, the fact that he had already found suspected narcotics on the defendant and the fact that he had observed a "pocket pager type of instrument commonly used in drug trafficking nowadays" on the console between the two seats on the transmission hump, when combined with

---

[5] The arresting officer testified at the suppression hearing that he did not "put" the passenger John Antone in custody until his search of the defendant's Buick disclosed a gun and other contraband. Antone was then arrested for possession of cocaine, possession of cocaine with intent to sell and "weapons in a vehicle."

[6] "The passenger compartment of the vehicle" meant, the officer testified, "the front seat, the rear seat, the glove compartment, console, under the seats, any other places where weapons or anything of value may be secreted or evidence."

the fact that he had found an empty holster under the front passenger seat, caused him to suspect that "there was a gun somewhere in [the] car." His "primary concern was not finding any other evidence, it was locating the gun."

As he proceeded in his search, he also saw two credit cards that did not belong to the defendant or Antone. On the rear seat behind the driver's seat he located "a plastic, heavy plastic security type box . . . a small safe . . . [it was] portable . . . it had a handle on it and a key type lock." Having noticed a large ring of keys with "perhaps over a dozen keys . . . on it" on the front seat where the defendant had been sitting, he went back and asked the defendant which key would open the safe. The defendant proved uncooperative and, eventually, after trying some of the keys, the officer found the right key and opened the safe. Inside the safe, the officer discovered a .38 caliber loaded snubnosed revolver in a leather purse type container, a bag containing ninety-one vials (similar to the red and clear plastic vial found in the defendant's pocket, that contained the crack) of crack, "a few other containers of white powdered substance" (eventually found to be heroin and some cocaine), a note pad containing various records ("telephone numbers and such"), a watch and "a few other things." Antone was then placed under arrest for possession of cocaine, possession of cocaine with intent to sell and having weapons in a motor vehicle. A wrecker was called to tow the defendant's Buick to the Westport police barracks. The wrecker arrived within about fifteen minutes. It would have been normal police procedure to inventory the contents of the vehicle after it had been towed. Both the defendant and Antone were transported to police barracks and were subjected to full searches of their persons. No further evidence "or anything" was seized.

Initially, the defendant recognizes that the United States Supreme Court has held that the fourth amendment to the federal constitution permits police, who have made a custodial arrest of a person apprehended while operating a motor vehicle while his license to do so is suspended, to search his person. *United States* v. *Robinson,* 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973); see *Gustafson* v. *Florida,* 414 U.S. 260, 94 S. Ct. 488, 38 L. Ed. 2d 456 (1973). In like fashion, he acknowledges that the same court has construed the fourth amendment to permit police, after making a lawful arrest, to search the interior of the arrestee's motor vehicle, including any closed containers, for weapons and contraband. *New York* v. *Belton,* 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981). He then concedes that anyone who is lawfully arrested, even for a minor traffic offense, has no complaint under federal law if police search his person and his motor vehicle, including its contents.

Given this posture of the federal law, the defendant has invoked the Connecticut constitution, specifically article first, § 7, thereof, properly pointing out that the United States Supreme Court's decisions do not limit the authority of state courts to interpret their state constitutions to give greater rights and protections than the federal constitution gives. In that context, that court has specifically recognized that each state has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); see *Oregon* v. *Hass,* 420 U.S. 714, 718, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975). Moreover, we note that that court has also stated that its holdings "[do] not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so." *Cooper*

v. *California,* 386 U.S. 58, 62, 87 S. Ct. 788, 17 L. Ed.
2d 730, reh. and modification denied, 386 U.S. 988, 87
S. Ct. 1283, 18 L. Ed. 2d 243 (1967); see *State* v.
*Kimbro,* 197 Conn. 219, 235, 496 A.2d 498 (1985).

The defendant, accordingly, urges that this case is
appropriately one to which the rights and protections
of the constitution of Connecticut, article first, § 7,
apply not only because his individual privacy interest
in his person was violated, but also because "the privacy
rights of every [Connecticut] citizen will be endan-
gered" if the holding of *Robinson* is enshrined in arti-
cle first, § 7, of our constitution. He stresses that the
principles that justify searches incident to arrest "are
not generally present" in the context of arrests for
motor vehicle offenses, particularly motor vehicle
arrests of the type present in this case. While realiz-
ing the need by the officer for a protective search
against weapons, he claims that this need was satis-
fied when no weapons were found and that, therefore,
there was no necessity, after feeling nothing "bulky
or obvious," to go into his pockets. The defendant
asserts this although state police departmental regu-
lations require a custodial arrest in every instance
where a motorist is found driving while his license to
do so is under suspension. Arguing that *Robinson*
eliminates the requirement that police act reasonably
in carrying out such warrantless searches and
mechanistically applies its "bright line" test to cases
and thus authorizes searches that derogate individual
rights, he advocates rejecting *Robinson* by expanding
the rights and protections of persons under article first,
§ 7, of our constitution to make such searches "unrea-
sonable." He also urges that we evaluate "reasonable-
ness" on a case-by-case basis as is done in such cases
as *State* v. *Kaluna,* 55 Haw. 361, 366, 520 P.2d 51
(1974). It is clearly implicit throughout the defendant's
Connecticut constitutional claim that the evidence

sought to be suppressed must be suppressed if it was obtained in violation of article first, § 7, of the constitution of Connecticut. This claim must assume that *State* v. *Reynolds,* 101 Conn. 224, 125 A. 636 (1924), is not controlling in this case.

The state, on the other hand, argues that the search of the defendant's person and his motor vehicle was reasonable and did not violate the search and seizure provision of the Connecticut constitution, article first, § 7. In doing so, after advancing its views and cautions to be considered in the application of principles of state constitutional interpretation, it posits that "conferring greater rights always carries greater costs," including the diminution of the powers of the police, which are aimed at promoting the public good by the prevention of crime. Maintaining the "virtual identity" of language in the United States[7] and Connecticut constitutional search and seizure provisions, it argues that the defendant's claim that the state constitutional standard for reasonableness is, or should be, different is without support. In any event, it urges that the search and seizure in this case was "reasonable." It goes on to contend that even if the search and seizure in this case was unlawful, suppression was not required because, under *State* v. *Reynolds,* supra, Connecticut has no state constitutional exclusionary rule. The state insists vigorously that *Reynolds* controls the defendant's constitutional claims. In the event, however, that a state exclusionary rule is "created," the state argues, citing *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677, reh. denied, 468 U.S. 1250, 105 S.

---

[7] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Ct. 52, 82 L. Ed. 2d 942 (1984), that a "good faith" exception should be recognized and applied in this case.

We turn now to the defendant's claim that we reject *Robinson* and interpret the constitution of Connecticut, article first, § 7, so as to render the search and seizure in this case "unreasonable" and hence unconstitutional. Before we dispose of this precise issue, however, we encounter the state's argument that Connecticut does not have a state constitutional exclusionary rule and that, if we "create" such a rule, a good faith exception to it should be recognized and applied in this case. Not only has the state insisted that the rule of *State* v. *Reynolds,* supra, is a bar to the defendant's Connecticut constitutional claims, but also the defendant himself implicitly assumes, to the contrary, that *Reynolds* is no longer part of our law. Accordingly, we address first the viability of *Reynolds.*

The state, citing the 1924 case of *State* v. *Reynolds,* supra, maintains that we have emphatically rejected an exclusionary rule in Connecticut for state constitutional violations. It argues, referring specifically to *State* v. *Kimbro,* supra, and *State* v. *Scully,* 195 Conn. 668, 674, 490 A.2d 984 (1985), that, although later decisions *"appear to* have assumed the existence of such a rule," we have never overruled "[our] prior holdings that are directly on point." (Emphasis added.) In *Reynolds* this court affirmed the admission into evidence of liquor seized in violation of the constitution of Connecticut, article first, §§ 8 and 9.[8] In doing so,

---

[8] At the time that *State* v. *Reynolds,* 101 Conn. 224, 125 A. 636 (1924), was decided, the constitution of Connecticut, article first, §§ 8 and 9, provided: "SEC. 8. The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation.

"SEC. 9. In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to demand the nature and cause of the accusation; to be confronted by the witnesses against him; to have com-

it drew heavily upon its earlier decision in *State* v. *Griswold*, 67 Conn. 290, 34 A. 1046 (1896), which likewise affirmed the admission of evidence seized in violation of the same sections of our constitution. In *Reynolds*, in construing our constitution, article first, §§ 8 and 9, we declined to apply the limited exclusionary rule of *Weeks* v. *United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), which held that evidence obtained in violation of the fourth amendment to the federal constitution was inadmissible in the government's case-in-chief in the federal courts. *State* v. *Reynolds*, supra, 237. For some years after *Reynolds*, we continued to follow that case,[9] but *Reynolds* is now no longer the law in Connecticut.

In 1961, the United States Supreme Court, invoking the due process clause of the fourteenth amendment, held in *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961), that all evidence obtained by searches and seizures in violation of the fourth amendment to the federal constitution was inadmissible in a state court criminal case. At that time,

---

pulsory process to obtain witnesses in his favor; and in all prosecutions by indictment or information, a speedy, public trial by an impartial jury. He shall not be compelled to give evidence against himself, nor be deprived of life, liberty or property, but by due course of law. And no person shall be holden to answer for any crime, the punishment of which may be death or imprisonment for life, unless on a presentment or an indictment of a grand jury; except in the land or naval forces, or in the militia when in actual service in time of war, or public danger."

[9] In a post-*Reynolds* case, *State* v. *Carol*, 120 Conn. 573, 181 A. 714 (1935), we again refused to reverse the trial court's ruling admitting evidence claimed to have been seized in violation of the constitution of Connecticut, article first, §§ 8 and 9, citing *State* v. *Reynolds*, 101 Conn. 224, 125 A. 636 (1924). Chief Justice Maltbie said in *Carol*: "The decisions we have cited determine the law of this State to be that articles offered in evidence, which are relevant to the issue of the guilt or innocence of an accused person, will not be excluded because they may have been seized in violation of the provision of our constitution forbidding unreasonable searches and seizures . . . . " *State* v. *Carol*, supra, 575.

Connecticut was one of the states that did not favor an exclusionary rule as a part of its state constitutional law. We so indicated in our first post-*Mapp* decision when we said: "It has long been the law in this state that evidence, although obtained by unlawful search and seizure, is, nevertheless, admissible in a criminal prosecution. *State* v. *Carol,* 120 Conn. 573, 575, 181 A. 714 [1935]; *State* v. *Reynolds,* [supra, 231]; *State* v. *Magnano,* 97 Conn. 543, 546, 117 A. 550 [1922]; *State* v. *Griswold,* supra, 306]." *State* v. *DelVecchio,* 149 Conn. 567, 572, 182 A.2d 402 (1962).

After our decision in *State* v. *DelVecchio,* supra, we decided *State* v. *Collins,* 150 Conn. 488, 191 A.2d 253 (1963). In *Collins,* the trial court's refusal to suppress certain evidence was assigned as error. On appeal, the state argued that a motion to suppress was unknown, citing *State* v. *Magnano,* supra, 547. See also *State* v. *Carol,* supra, 574–75; *State* v. *Reynolds,* supra, 235. In *Collins,* Chief Justice King said (p. 489): "One reason why such a motion was not formally entertained was that prior to the decision in *Mapp* v. *Ohio,* [supra], *any illegality in the search and seizure of evidence was irrelevant on the question of its admissibility.*" (Emphasis added.)

Some years later, in 1985, this court decided *State* v. *Kimbro,* supra. In *Kimbro,* we concluded that article first, § 7, of the constitution of Connecticut "affords more substantive protection to citizens than does the fourth amendment to the federal constitution in the determination of probable cause." Id., 223. In doing so, we said (p. 234): "We clearly have the power to construe the Connecticut constitution in accordance with our particular analysis of the specific right in issue." See also *State* v. *Barrett,* 205 Conn. 437, 442, 534 A.2d 219 (1987); *State* v. *Jarzbek,* 204 Conn. 683, 707–708, 529 A.2d 1245 (1987); *State* v. *Scully,* 195 Conn. 668, 674 n.11, 490 A.2d 984 (1985); *Griswold Inn, Inc.* v.

*State,* 183 Conn. 552, 559 n.3, 441 A.2d 16 (1981). *Kimbro* impliedly overruled *Reynolds* even though it did not expressly refer to that case. "It is an established rule of law that a later decision overrules prior decisions which conflict with it, whether such prior decisions are mentioned and commented upon or not." *In re Lane,* 58 Cal. 2d 99, 105, 372 P.2d 897, 22 Cal. Rptr. 857 (1962); see *Soblan Construction Co.* v. *Government of the Territory of the Pacific Islands,* 526 F. Sup. 135, 142 (D.C. Mariana Islands 1981). "The drift away from [*State* v. *Reynolds*] has been so great that it can no longer be deemed a controlling authority." *Olsen* v. *Nebraska,* 313 U.S. 236, 244, 61 S. Ct. 862, 85 L. Ed. 1305 (1941); see *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U.S. 356, 361–65, 93 S. Ct. 1001, 35 L. Ed. 2d 351, reh. denied, 411 U.S. 910, 93 S. Ct. 1523, 36 L. Ed. 2d 200 (1973). Any "authority of an older case may be as effectively dissipated by a later trend of decision as by a statement expressly overruling it." *Sei Fujii* v. *California,* 38 Cal. 2d 718, 728, 242 P.2d 617 (1952). *Kimbro* has, therefore, effectively overruled any vitality of *Reynolds.*

*Reynolds* is also no longer the law in Connecticut because, contrary to the prevailing view at the time *Reynolds* was decided in 1924, the exclusionary rule is now widely recognized as an effective remedy for enforcement of the constitutional protection against unconstitutional searches and seizures.

Preliminarily, we note that the *Reynolds* court adduced several reasons for its position which now have no justification today. We mention only one. In rejecting the claim that the evidence in question should have been excluded on the defendant's motion, the court said: "To stop the trial of a criminal cause upon an objection to the introduction of evidence, otherwise admissible, because illegally obtained, in order to determine whether the evidence was so obtained in viola-

tion of the accused's constitutional rights, delays the regular course of the trial *to try an issue foreign to the cause on trial,* and if the issue be found in favor of the accused the evidence excluded may be determinative of the guilt of the accused. Wigmore on Evidence (2d Ed.) Vol. 4, § 2183."[10] (Emphasis added.) *State* v. *Reynolds,* supra, 235. With this, it is understandable why the state could argue before us, citing to *Reynolds* and *Magnano,* that the motion to suppress "[was] unknown to our trial procedure" and that we acknowledged that pre-*Mapp* such a motion was not "entertained." *State* v. *Collins,* supra, 489.

Although limiting its use on occasion, the United States Supreme Court has continued to recognize the deterrent effect of the exclusionary rule. See *Immigration & Naturalization Service* v. *Lopez-Mendoza,* 468 U.S. 1032, 1050, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984); *Stone* v. *Powell,* 428 U.S. 465, 486–87, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976); *United States* v. *Janis,* 428 U.S. 433, 446, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976); *United States* v. *Calandra,* 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974); *Terry* v. *Ohio,* 392 U.S. 1, 12, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *Mapp* v. *Ohio,* supra. An increasing number of state courts have given judicial recognition to its deterrent quality. See, e.g., *People* v. *Casias,* 193 Colo. 66, 73, 563 P.2d 926 (1977); *People* v. *Campbell,* 67 Ill. 2d 308, 317, 367 N.E.2d 949 (1977), cert. denied sub nom. *Myers* v. *Illinois,* 435 U.S. 942, 98 S. Ct. 1521, 55 L. Ed. 2d 538 (1978); *State* v. *Ercolano,* 79 N.J. 25, 37–38,

---

[10] As long ago as 1961, the same treatise said the following in the same section cited by the court in *State* v. *Reynolds,* 101 Conn. 224, 235, 125 A. 636 (1924): "[T]he relatively modern federal doctrine excluding evidence seized in violation of search and seizure laws . . . has had a magnetic effect. At the present time [1961], nearly half of the fifty states can be said to have adopted the federal limitation to the general principle [against exclusion] of this section with some or all of its detailed discriminations." 8 J. Wigmore, Evidence (McNaughton Rev. 1961) § 2183, p. 8.

397 A.2d 1062 (1979); *State* v. *Marsh,* 162 N.J. Super. 290, 301, 392 A.2d 672 (1978), aff'd, 168 N.J. Super. 352, 403 A.2d 28 (1979); *People* v. *Lopez,* 118 App. Div. 2d 873, 875, 500 N.Y.S.2d 359 (1986); *State* v. *Spratt,* 386 A.2d 1094, 1095 (R.I. 1978); *State* v. *Kraimer,* 91 Wis. 2d 418, 283 N.W.2d 438 (1979), aff'd, 99 Wis. 2d 306, 298 N.W.2d 568 (1980), cert. denied, 451 U.S. 973, 101 S. Ct. 2053, 68 L. Ed. 2d 353 (1981).

In our system of federalism, it is established that state constitutions may be a source of "individual liberties more expansive than those conferred by the Federal Constitution." *Pruneyard Shopping Center* v. *Robins,* supra, 81; see L. Sager, "Symposium: The Emergence of State Constitutional Law," 63 Tex. L. Rev. 959 (1985); "Developments of the Law—The Interpretation of State Constitutional Rights," 95 Harv. L. Rev. 1324 (1982); W. Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L. Rev. 489 (1977).

We have turned to our own constitution, when appropriate, to afford our citizens broader protection of certain personal rights than that afforded by similar or even identical provisions of the federal constitution. See *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Jarzbek,* supra; *State* v. *Kimbro,* supra; *State* v. *Scully,* supra; *State* v. *Couture,* 194 Conn. 530, 546 n.2, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984); *Fasulo* v. *Arafeh,* 173 Conn. 473, 475, 378 A.2d 553 (1977); *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977). In doing so, we acknowledge the concern for interaction between this court and the United States Supreme Court. Yet, in evaluating federal constitutional claims by a litigant, we stand on a different footing than when evaluating claims under our state constitution. On such federal claims, we are

roughly akin to an intermediate court, attempting to apply the "supreme law of the land." See *Cooper* v. *Aaron*, 358 U.S. 1, 17, 78 S. Ct. 1401, 3 L. Ed. 2d 5 (1958). The authority of the United States Supreme Court over such federal rulings is full and complete. But if our ruling is clearly based upon an adequate and independent state ground, federal review is limited to a determination of whether Connecticut law violates some provision of federal law. See, e.g., *Pruneyard Shopping Center* v. *Robins,* supra, 79; *Delaware* v. *Prouse,* 440 U.S. 648, 651–53, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); see *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). This is so whether a criminal or civil matter is at issue.

Although in interpreting the Connecticut constitution we have agreed with and followed the federal handling of consonant provisions of the federal constitution, this court has never considered itself bound to adopt the federal interpretation in interpreting the Connecticut constitution. Our system of federalism requires no less. But of even weightier concern is the authority of our state constitution, the fundamental charter of our state, and it is this court's duty to interpret and enforce our constitution. Here we note that the United States Supreme Court or its individual members have often called the attention of state courts to their independent responsibility for the constitutional laws of their states.[11] Thus, in a proper case

[11] See, e.g., *Moran* v. *Burbine,* 475 U.S. 412, 428, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986); *South Dakota* v. *Neville,* 459 U.S. 553, 566–71, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983) (Stevens, J., dissenting); *United States* v. *Miller,* 425 U.S. 435, 454 n.4, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976) (Brennan, J., dissenting); *Wisconsin* v. *Constantineau,* 400 U.S. 433, 439–43, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971) (Burger, J., dissenting).

Justice Sandra Day O'Connor has also stated: " 'There is a fine line, of course, between a state court holding that an action *independently* violates both the State and Federal Constitutions, and holding that the State Constitution is violated *because* the Federal Constitution is violated. Recently,

"the law of the land" may not, in state constitutional context, also be "the law of the state of Connecticut." In recent years, many state supreme courts have interpreted their state constitutions to afford more expansive protection to fundamental rights of their citizens, particularly in the area of civil liberties including searches and seizures. See, e.g., *Reeves* v. *State,* 599 P.2d 727 (Alaska 1979); *People* v. *Sporleder,* 666 P.2d 135 (Colo. 1983); *State* v. *Kaluna,* supra; *Bierkamp* v. *Rogers,* 293 N.W.2d 577 (Iowa 1980); *People* v. *Hoshowski,* 108 Mich. App. 321, 310 N.W.2d 228 (1981); *People* v. *Williams,* 93 Misc. 2d 93, 402 N.Y.S.2d 289 (1978); *State* v. *Flores,* 280 Or. 273, 570 P.2d 965 (1977); *People* v. *Neville,* 346 N.W.2d 425 (S.D. 1984); *Miller* v. *State,* 584 S.W.2d 758 (Tenn. 1979); *State* v. *Ringer,* 100 Wash. 2d 686, 674 P.2d 1240 (1983); see "Developments in the Law—The Interpretation of State Constitutional Rights," supra, 1389–90. This has been significantly so because of the ebb and flow in the federal case law in recent years as it impacts on the protections afforded fundamental constitutional rights of individuals.

Constitutional provisions must be interpreted within the context of the times. See, e.g., *Weems* v. *United*

there has been a tendency for the Supreme Court to find no independent state ground and to assert its power to review if it appears that both federal and state constitutional provisions are cited by the state court, that the state cases generally follow the federal interpretation, and the state court does not clearly and expressly articulate its separate reliance on independent state grounds. See *South Dakota* v. *Neville,* [supra]; *Delaware* v. *Prouse,* 440 U.S. 648 [99 S. Ct. 1391, 59 L. Ed. 2d 660] (1979).

" 'The point of this discussion is to emphasize that, as state court judges, you have a very real power to decide cases, whether they are civil or criminal, on state grounds alone, if they exist, or to indicate clearly and expressly that the decision is alternatively based on separate and independent state grounds. . . .' " (Emphasis added.) Speech by Hon. Sandra D. O'Connor, Associate Justice, United States Supreme Court at The National Judicial College, Reno, Nevada (May 13, 1983); *State* v. *Kennedy,* 295 Or. 260, 271 n.10, 666 P.2d 1316 (1983).

*States,* 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910); *State* v. *Cannon,* 55 Del. 587, 594, 190 A.2d 514 (1963); *People* v. *Neumayer,* 405 Mich. 341, 365, 275 N.W.2d 230 (1979); *Wylie Bros. Contracting Co.* v. *Albuquerque-Bernalillo C. A. C. B.,* 80 N.M. 633, 639, 459 P.2d 159 (1969); *Seattle School District* v. *State,* 90 Wash. 2d 476, 516, 585 P.2d 71 (1978). As one court said: "We must *interpret* the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning." (Emphasis in original.) *Seattle School District* v. *State,* supra. It is this court's duty to assure that our constitution does not become "a magnificent structure . . . to look at, but totally unfit for use." *Gibbons* v. *Ogden,* 22 U.S. (9 Wheat.) 1, 222, 6 L. Ed. 23 (1824). Moreover, a constitution is, in Chief Justice John Marshall's words, "intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." (Emphasis in original.) *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819). One court put it this way: "In short, the [Washington] constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness." *Seattle School District* v. *State,* supra, 517; see *Missouri* v. *Holland,* 252 U.S. 416, 433, 40 S. Ct. 382, 64 L. Ed. 641 (1920); *Humana of New Mexico, Inc.* v. *Board of County Commissioners,* 92 N.M. 34, 36, 582 P.2d 806 (1978). We agree. The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens.

We now go on to address the defendant's claim that his rights against unreasonable searches and seizures under article first, § 7, of the Connecticut constitution

were violated by the scope of the search at the time of his highway arrest. We are required in this case for the first time to interpret our state constitution's proscription against unreasonable searches and seizures in the context of a highway motor vehicle stop and arrest. Certain observations concerning *United States v. Robinson,* supra, and the motor vehicle exception to the warrant requirement of the fourth amendment to the United States constitution are useful both as background and assistance in our resolution of the distinctive issue presented under our state constitution. In a case not involving a motor vehicle, the United States Supreme Court has said that when an arrest is made, "it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape" as well as "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel* v. *California,* 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). Left unresolved in *Chimel* was the issue of whether the right to make such searches of the person followed automatically from the fact that a lawful arrest had been made or whether such searches could be made only when the circumstances of the individual case indicated some likelihood that either weapons or evidence would be found. This issue has reached lower courts with some frequency. 2 W. LaFave, Search and Seizure (2d Ed.) § 5.2, p. 437. Some courts have allowed no more than a pat-down when the only conceivable purpose was the protection of the arresting officer, while others have taken a broader view and have determined that a full search of the person incident to a lawful arrest was "per se reasonable." In 1973, the United States Supreme Court, in *United States* v. *Robinson,* supra, and its companion case of *Gustafson* v. *Florida,* supra, held that the latter was

permissible under the fourth amendment. *Robinson* upheld the legality of a full body search of an individual conducted at the scene of his highway arrest incident to his lawful arrest for driving a motor vehicle without a valid operator's permit.

The significant background facts in *Robinson* were as follows: On April 23, 1968, at about 11 p.m., Officer Richard Jenks of the District of Columbia metropolitan police department saw the defendant Robinson operating a motor vehicle in which there were three passengers. From a check four days earlier of Robinson's operator's permit, Jenks had reason to believe that the defendant was operating a motor vehicle after the revocation of his operator's permit. This offense is defined by statute in the District of Columbia and carries a mandatory minimum jail term, a mandatory minimum fine or both. Robinson stopped his vehicle on Jenks' signal and he and all the passengers got out. At that point, Jenks told the defendant that he was under arrest for "operating after revocation and obtaining a permit by misrepresentation." *United States* v. *Robinson*, supra, 220. Probable cause to make the arrest was conceded; Jenks made a "full custody" arrest. Jenks proceeded to make a full "field type search" of Robinson in accordance with procedures prescribed by police department instructions. During the pat-down, Jenks felt an object in the breast pocket of the defendant's heavy coat but he "couldn't tell what it was" and he "couldn't actually tell the size of it." Id., 223. Jenks then reached into the pocket and pulled out the object which was a "crumpled up cigarette package." Even at this point, Jenks did not know what was in the package although he could feel "objects" in that package. He opened the package and found fourteen gelatin capsules of white powder, which he thought to be, and which on later analysis proved to be, heroin. The lower court had decided that "even after a police

officer lawfully places a suspect under arrest for the purpose of taking him into custody, he may not ordinarily proceed to fully search the prisoner. He must, instead, conduct a limited frisk of the outer clothing and remove such weapons that he may, as a result of that limited frisk, reasonably believe and ascertain that the suspect has in his possession." Id., 227.

The *Robinson* majority, after referring to its prior decisions and "early authorities," entertained no view that they had placed that "sort of limitation" that the lower court had on the "traditional and unqualified authority of the arresting officer to search the arrestee's person." Id., 229. The majority then went on to conclude that it was, therefore, not "inclined . . . to qualify the breadth of the general authority to search incident to a lawful custodial arrest on an assumption that persons arrested for the offense of driving while their licenses have been revoked are less likely to possess dangerous weapons than are those arrested for other crimes." Id., 234. *Robinson* not only said that a custodial search of a suspect based on probable cause constituted "a reasonable intrusion" under the fourth amendment, but that, "that intrusion being lawful, a search incident to the arrest requires no additional justification." Id., 235. It was the fact of the lawful arrest which established the authority to search, said the *Robinson* court, but it also held that "in the case of a lawful custodial arrest a *full search* of the person is *not only* an exception to the warrant requirement of the Fourth Amendment *but is also* a 'reasonable' search under that Amendment." (Emphasis added.) Id. Justice Rehnquist wrote for the majority that "[i]t is scarcely open to doubt that the danger to an officer is far greater in the case of extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the *Terry*-type

stop. [*Terry* v. *Ohio,* supra.] *This is an adequate basis for treating all custodial arrests alike for the purposes of search justification."* (Emphasis added.) *United States* v. *Robinson,* supra, 234–35.

*Robinson,* however, had a "more fundamental dis-agreement" with the lower court and that was concerning the "suggestion" that there had to be a case by case litigation of "the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." Id., 235. Laying down what is arguably a bright line test, *Robinson* said: "A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." Id. We particularly note the broad sweep of *Robinson* here as it is readily apparent from the passage just quoted that it explicitly rejected *any* evidentiary standard for a search incident to a lawful custodial arrest.

On the other hand, the *Robinson* dissenters, speaking through Justice Marshall, interestingly acknowl-

edged their approval of the lower court's opinion on the pat-down phase[12] of Robinson's coat pocket, with Justice Marshall's opinion noting that the "[District of Columbia] Court of Appeals[13] unanimously affirmed the right of a police officer to conduct a limited frisk for weapons when making an in-custody arrest, *regardless of the nature of the crime for which the arrest was made.*" (Emphasis added.) Id., 250 (Marshall, J., dissenting.). In any event, the *Robinson* majority made it clear that no evidentiary standard or degree of probability of finding weapons or evidence was necessary to justify a search of a person incident to a custodial arrest, although the majority also indicated, in footnote 6, that it was not presently deciding what level of search was appropriate in the event of a "routine traffic stop." *Robinson,* we note, did not involve the search of a motor vehicle as does the matter on the appeal before us.

Initially, we state that, to the extent that *Robinson* allows unlimited searches in contexts that extend beyond full custodial arrests, we disavow its holding concerning the level of protection to which individuals are entitled against unreasonable searches and seizures under article first, § 7, of the Connecticut constitution. It is sufficient for us in this case to note that our automobile exception permits a warrantless search of an automobile whenever the police have probable cause to do so. See, e.g., *State* v. *Badgett,* 200 Conn. 412, 428,

---

[12] In the dissent in *United States* v. *Robinson,* 414 U.S. 218, 248–49, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), Justice Thurgood Marshall eschewed the majority's rejection of the necessity under the fourth amendment to have the police officer's determination as to how and where to search the person of a suspect " 'to be broken down in each instance into an analysis of each step in the search.' " Rather, Justice Marshall felt that, in keeping with a case by case determination of such cases, the search in *Robinson* should be divided into three distinct phases: the pat-down of Robinson's coat pocket, the removal of an unknown object from the pocket and the opening of the crumpled-up cigarette package. Id., 249–50.

[13] *United States* v. *Robinson,* 471 F.2d 1082, 1098 (D. C. Cir. 1972), rev'd, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973).

512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 473, 93 L. Ed. 2d 373 (1986). It is also correct that we have recognized that the police may make a search without a warrant incidental to a lawful custodial arrest. Id., 424; see *New York* v. *Belton,* supra; *State* v. *Shaw,* 186 Conn. 45, 48, 438 A.2d 872 (1982). This court recognizes the need for protection of the police, as the state urges upon us, in the matter of highway stops of motor vehicles. Custodial arrests not only serve to protect the police themselves, but also serve the state interest in protecting society itself from violent acts of those arrested. They also serve to assist in the investigation of crime. Custodial arrests, however, obviously implicate constitutional values that are significant both to society in general and to individuals in particular.

We need not decide in this case, in interpreting article first, § 7, of the Connecticut constitution, whether a full body search of an occupant of a motor vehicle is authorized when only a minor traffic violation is involved. Both the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut create a reasonableness standard; both proscribe only unreasonable searches and seizures. In *State* v. *Januszewski,* 182 Conn. 142, 148, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), we said that "[t]here is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails. *Camara* v. *Municipal Court,* 387 U.S. 523, 536–37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)." "[A] search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), quoting *Katz* v. *United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.

Ed. 2d 576 (1967); *State* v. *Zindros,* 189 Conn. 228, 236–37, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). These exceptions, which "have been jealously guarded and carefully drawn"; *Jones* v. *United States,* 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958); include: (1) where searches have been undertaken "incident to a lawful custodial arrest"; see *New York* v. *Belton,* supra; and (2) where there is probable cause to believe that a motor vehicle contained contraband or evidence pertaining to a crime. See *State* v. *Januszewski,* supra, 152–54.

A police officer has the right to stop a motor vehicle operating on a Connecticut highway even if the reason for the stop is only an infraction under our traffic laws. Upon doing so, he "prudently may prefer" to ask that an occupant exit the vehicle; any intrusion upon an occupant's personal liberty in directing that action is de minimis because, on balance, it serves to protect the officer. See *Pennsylvania* v. *Mimms,* 434 U.S. 106, 110–11, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977). Even a reasonable direction to do so may be appropriate because "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry* v. *Ohio,* supra, 23. Where an operator is stopped by police for a traffic violation, the officer, in order to protect himself, has the right to go beyond a mere pat-down in conducting a search of the operator's person for weapons. Authorizing police under our constitution to go beyond a pat-down in searching a person for weapons means that the intensity of such a search is limited to that which, under the circumstances, is necessary to the discovery of weapons. Thus, it will depend upon what is reasonable to the officer at that time and permits the accomplishment of the purpose of neutralizing potentially available weapons without endorsing a broader purpose

of searching for evidence. There can be, as there were in this case, circumstances reasonably apparent to the officer that permit a full search of the person, both for weapons and for evidence.

We now address the specific circumstances of this case under the defendant's Connecticut constitutional claims. We cannot accept his claims in this case.

We address first the search of the defendant's person. The officer legally stopped the defendant's Buick vehicle, which displayed New York plates and was exceeding the speed limit by thirty miles per hour. After the officer instructed the defendant to return to his vehicle, from which he had exited and approached the police car, the officer then approached the defendant's vehicle and asked the defendant for his license, registration and insurance card. From his standing position on the driver's side, the officer, who had twelve years experience as a state policeman, not only observed that both the defendant and his male passenger were very nervous and "visibly shaking," but he also noticed a sticker on the dashboard that read "This car insured by Smith and Wesson," which he later testified was a reference to a well known manufacturer of firearms. He could also see two New York license plates on the floor behind the driver's seat. "Actions and things observed by an experienced law enforcement officer may have more significance to him in determining whether the law is being violated at a given time and place than they would have to a layman . . ." and such experience is entitled to "at least some weight" on the ultimate question of probable cause. *United States* v. *McClard,* 333 F. Sup. 158, 164 (E.D. Ark. 1971); see also commentary, A.L.I., Model Code of Pre-Arraignment Procedure § 120.1, pp. 297–98. While this did not constitute probable cause to arrest the defendant at that point for anything more than the motor vehicle violation, for which he had been stopped initially,

i.e., speeding, it can, in this case, be factored into the ultimate arrest for possession of narcotics with intent to sell and possession of a dangerous weapon in a motor vehicle.[14] See General Statutes §§ 21a-277 (a), 29–38.

After verifying the Buick's license plate and vehicle identification number, the officer learned that the defendant's operator's license had been suspended in both New York and Connecticut. Returning to the Buick, the officer informed the defendant that he was under arrest for speeding and for driving while his right to operate was under suspension. General Statutes §§ 14-215, 14-219. Operating a motor vehicle while under suspension is a misdemeanor. General Statutes § 14-215. The picture had changed. The police officer was now presented with a misdemeanant, who earlier had not only immediately exited his vehicle and approached the officer's vehicle when originally stopped, but who, upon returning to his vehicle,

---

[14] In *State* v. *Christian,* 189 Conn. 35, 454 A.2d 262 (1983), the defendant, ostensibly a resident of Canada, was stopped on Interstate 95 in Milford for speeding. Because he was unable at that time to demonstrate that he was a resident of a jurisdiction that was a member of the no-bail compact; see Practice Book § 1004; he was told by the arresting officer that "it was necessary under Connecticut law to take him into custody.".*State* v. *Christian,* supra, 37–38. A search of his person disclosed "a large wad of money" and a paper bag containing foil packets the officer suspected contained narcotics. The defendant, upon the officer's inquiry, told him that there was a pistol in the trunk of the car. A search of the trunk disclosed a loaded pistol, glassine envelopes and various identification cards of the defendant from other states.

*Christian* and the case before us are significantly different. The defendant in *Christian* did not contest the search of his person and his vehicle as incident to his arrest, but only the validity of the arrest itself, whereas in this case the defendant concedes the validity of his arrest but contests the search conducted of his person and his vehicle. It is true that in *Christian,* we found no fourth amendment violation, but it is also true that this court decided the defendant's motion to suppress solely on federal constitutional grounds and that article first, § 7, of the constitution of Connecticut formed no basis for nor was ever mentioned in our opinion.

appeared with his passenger to be nervous, "visibly shaking" as the officer observed the Smith and Wesson sticker on the dashboard and two New York license plates on the floor behind the driver's seat. Driving under suspension is not a routine traffic violation, it provides not only for a fine but also a term of imprisonment; it is thus a "crime" that may be sanctioned by both a fine and imprisonment. See General Statutes § 53a-24. There is no claim and no evidence that the pat-down search of this defendant, whom the officer now had probable cause to believe was guilty of a "crime," was in any way pretextual. We believe this officer, alone at 6:30 a.m., on Interstate 95, with the defendant and his passenger, could then comport himself in the circumstances of a custodial arrest. We conclude therefore that the officer's search of the defendant's person was legal.[15]

With reference to the legitimacy of the search of the defendant's vehicle, we conclude that it was proper. There is no need for us in this case to decide what authority the officer would have had under our constitution to search the vehicle for contraband when the only provocation for that was a traffic violation. This is so because once the officer had searched the defendant incident to a lawful arrest and found contraband, he then had probable cause to search the vehicle as he had grounds of the probable guilt of the defendant of a "crime," as defined under General Statutes § 53a-24. *New York* v. *Belton,* supra.[16] The discovery of the con-

---

[15] We also point out that when the police properly make a search incident to a lawful arrest and the defendant is taken to the police barracks, a full search of the defendant's person that discloses contraband would be constitutional because of the doctrine of inevitable discovery. See *Nix* v. *Williams,* 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

[16] In addition, the discovery of the evidence of the unrelated crime by the officer was also not the result of an unconstitutional search because after the defendant's vehicle had been towed to the police barracks, the

traband in the defendant's pockets, coupled with all the officer knew at that point, including the fact that he was now presented with a misdemeanant and not a mere traffic violator, gave him probable cause to search the vehicle for contraband. Black's Law Dictionary defines "contraband" as "any property which is unlawful to produce or possess." See *United States* v. *Williams,* 533 F. Sup. 448, 450 (E.D. Pa. 1982). We point out here that the officer's ability to search the vehicle is not to be justified as any continuation of his authority to conduct a pat-down search specifically for weapons in order to protect himself, but is justified on the ground that the escalation of the defendant's involvement had now risen from that of a mere traffic violation to probable guilt of a "crime" as our statutes define that term. Despite the fact that one does not enjoy the same expectation of privacy as to the interior of his motor vehicle as one does in the interior of one's home, nevertheless, "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge* v. *New Hampshire,* 403 U.S. 443, 461, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971). The same applies to an "automobile" under article first, § 7, of the constitution of Connecticut. The exception to the warrant requirement in an automobile search demands that the searching officer have probable cause to believe that the vehicle contains contraband. *Carroll* v. *United States,* 267 U.S. 132, 153–54, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *State* v. *Badgett,* supra, 429. So does article first, § 7, of our constitution. We believe that this officer had, as we have outlined, objective facts upon which could be based

contraband in his car would have been found in the inventory search at the barracks under the inevitable discovery rule. See *Nix* v. *Williams,* 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State* v. *Badgett,* 200 Conn. 412, 433–34, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 473, 93 L. Ed. 2d 373 (1986).

a finding of probable cause to search the defendant's vehicle for contraband. Accordingly, the motion to suppress was correctly denied by the trial court.[17]

There is no error.

In this opinion PETERS, C. J., and GLASS, J., concurred.

SHEA, J., with whom COVELLO, J., joins, concurring. Although I agree with the majority that the exclusionary rule should be applicable to evidence seized in violation of state as well as federal constitutional provisions, and that this court has authority to construe our state constitution to give greater protection against illegal seizures than that afforded by our federal constitution, I see no necessity in this case for such an elaborate treatise on that subject by way of obiter dictum. As the majority recognizes, the same conclusion, that the evidence found in the search of the defendant's person and also in the search of his automobile was not unlawfully seized, would be reached under both state and federal constitutional provisions. This court has previously held implicitly in *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), where our state constitutional prohibition against unreasonable searches was construed to have been violated, although its federal counterpart had not been, that the exclusionary rule was applicable to a state constitutional violation, thus over-

---

[17] In *Massachusetts* v. *Sheppard,* 468 U.S. 981, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984), a companion case to *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677, reh. denied, 468 U.S. 1250, 105 S. Ct. 52, 82 L. Ed. 2d 942 (1984), the United States Supreme Court applied a good faith exception to the exclusionary rule. We have not heretofore had the need to determine the existence of a good faith exception to the exclusionary rule under our state constitution. See *State* v. *Cates,* 202 Conn. 615, 624, 522 A.2d 788 (1987); *State* v. *Shifflett,* 199 Conn. 718, 751, 508 A.2d 748 (1986). Further, in light of our holding today on the facts before us, we need not address the issue whether such a good faith exception exists and should be applied in this case.

ruling sub silentio *State* v. *Reynolds,* 101 Conn. 224, 125 A. 636 (1924). If we are ever to reexamine the position we took in *Kimbro,* we should at least wait for a case where further consideration of the subject is relevant to the disposition of the appeal.

As I understand the majority opinion, it approves as consistent with our state constitutional prohibition against unreasonable searches and seizures; Conn. Const., art. I, § 7; the holding in *United States* v. *Robinson,* 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), that a search of those arrested for traffic violations of a kind for which custody is required,[1] as in this case, need not be limited to a frisk of the outer clothing for weapons, the kind of search approved in *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), for police encounters with suspicious persons on the street. Rather than endorse under our state constitution the broader holding of *Robinson* that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment"; *United States* v. *Robinson,* supra, 235; the majority would limit "the intensity of such a search . . . to that which, under the circumstances, is necessary to the discovery of weapons. Thus, it will depend upon what is reasonable to the officer at that time and permits the accomplishment of the purpose of neutralizing potentially available weapons without endorsing a broader purpose of searching for evidence."[2]

---

[1] The majority opinion declares: "Where an operator is stopped by police for a traffic violation, the officer, in order to protect himself, has the right to conduct a search of his person for weapons that goes beyond a mere pat-down." I assume that the "traffic violation" referred to is one for which custody is justified and not one for which the officer is authorized only to issue a summons.

[2] In *State* v. *Christian,* 189 Conn. 35, 40–41, 454 A.2d 262 (1983), where the defendant was stopped for speeding under circumstances requiring that

By attempting in this fashion to restrict the scope of searches made by arresting officers of those who are to be taken into custody, whether traffic offenders or others, the majority invites a great deal of litigation in defining precisely how far beyond a "mere pat-down" a police officer may go in protecting himself and makes the validity of a search depend largely upon the intentions of the officer in conducting it. The opinion provides little guidance to an officer, whose determination as to how extensively he may search a person he has arrested is necessarily a quick ad hoc judgment. By making the critical issue whether the purpose of the officer was to protect himself or to discover evidence of a crime, the opinion invites a new round of swearing contests involving constitutional rights.

The majority apparently agrees with *Robinson* that no distinction should be made in respect to the permissible scope of a search for weapons between traffic offenders and violators of the criminal law when a custodial arrest is required. The opinion recognizes that such a search may include any reasonable measure that, "under the circumstances, is necessary to the discovery of weapons." The majority, however, would bar the search of a traffic offender for evidence, presumably allowing such a search of a criminal offender. I see no

---

he be taken into custody, this court approved the full search the defendant claimed the officer had made of his person that had resulted in the discovery of narcotics as follows: "If the search of the defendant's person was of the search-for-weapons variety sanctioned by *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), as a protective measure when a policeman stops a person who he reasonably suspects has committed an offense, no fourth amendment infraction would have occurred. If it exceeded the limits of such a search, it was in effect a seizure of the person amounting to an arrest. The existence of probable cause based upon the speeding violation, however, satisfies the fourth amendment. See *United States* v. *Robinson,* [414 U.S. 218, 232–35, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)]." Thus, we followed *Robinson* by sanctioning a full search of a traffic offender where custody was authorized by law.

constitutional basis for making such a distinction between those arrested for traffic offenses and for crimes when the violation of law is such that custody is required, as in the present case. In either event, "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *United States* v. *Robinson,* supra, 235.

Although the safety of the officer is undoubtedly the paramount concern that justifies a search of a person to be taken into custody, there are other reasons significantly related to law enforcement that justify the rule we have followed heretofore permitting searches of those arrested for violating the criminal law for evidence as well as for weapons. *State* v. *Copeland,* 205 Conn. 201, 210–11, 530 A.2d 603 (1987); *State* v. *Christian,* 189 Conn. 35, 40–41, 454 A.2d 262 (1983). In the course of being transported to the police station a person may not only have an opportunity to conceal or dispose of evidence in his possession but may also consume some substance on his person detrimental to himself. A full body search is commonly made at the police station of an arrested person who is to be held in custody for any substantial period to ensure that no contraband is introduced or made available to others similarly held. Where a station house search of an arrested person would have been made in any event and would have resulted in the discovery of the same items the arresting officer has found in a search contemporaneous with the arrest, it is difficult to perceive what purpose would be served by suppressing the evidence discovered by the officer on the ground that the "full" search took place at the scene of the arrest rather than the police station. These considerations are sufficiently applicable to traffic offenders taken into cus-

tody to undermine any basis for distinguishing between them and others in respect to the scope of a permissible search by an arresting officer.

Because the limitation placed by the majority opinion creates problems for law enforcement without affording as a practical matter any substantial additional protection to those who are taken into custody for a traffic offense, I would adopt the *Robinson* position that no distinction should be made between traffic offenders and others who are to be taken into custody in defining the scope of the search made at the scene by a police officer.

I also disagree with the view expressed by the majority that the lawfulness of a warrantless automobile search may not be justified by the need of an arresting officer to search not only the person but also the automobile of the traffic offender he has arrested in order to protect himself against weapons accessible to the offender. In *Chimel* v. *California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), the United States Supreme Court held that a lawful custodial arrest allows the police to make a contemporaneous search without a warrant not only of the person arrested but also of the immediately surrounding area. Justification for such searches was found in the need to remove weapons that the arrestee "might seek to use in order to resist arrest or effect his escape" and to prevent the concealment or destruction of evidence. Id., 762–63. In *New York* v. *Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), this principle was applied to allow a police officer who has made a lawful custodial arrest of the occupant of an automobile, as a contemporaneous incident of that arrest, to search the passenger compartment of the automobile. The rationale for this extension of *Chimel* was that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact

generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].' " Id., 460, quoting *Chimel* v. *California,* supra, 763.[3] Because an officer under a duty to make a custodial arrest of a traffic offender should be able to make as full a search of the offender as the officer believes his own safety warrants, he should also be able to search the passenger compartment of the automobile involved to be sure that it contains no weapon the offender might obtain while he remains in the vicinity of the automobile. See *State* v. *Badgett,* 200 Conn. 412, 426–28, 512 A.2d 160, cert. denied, 479 Conn. 940, 107 S. Ct. 473, 93 L. Ed. 2d 373 (1986). In the case before us, for example, until the .38 caliber revolver was found in the search of the car, a serious threat was posed to the safety of the two police officers involved during the course of their encounter with the defendant and his companion.[4]

I would justify the search of the defendant's person on the ground that a full search should be permitted

[3] Although a search of an automobile incident to a lawful arrest has been deemed to permit the seizure of evidence as well as weapons found in the vehicle; *New York* v. *Belton,* 453 U.S. 454, 460–61, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981); we need not in this case consider whether the possibility that a traffic offender might be able to reach into the passenger compartment of his car to destroy or conceal evidence of some crime would also justify its search. The arresting officer testified that his "primary concern" in making the search was "locating the gun." Furthermore, the officer had discovered evidence of unlawful drugs in searching the defendant outside the car justifying his arrest for the offense of drug possession as well as for operating while his license was suspended. The search of the car, therefore, was not subject to any special limitations that possibly might apply to the search of the automobile of a person arrested solely as a traffic offender.

[4] The available statistical evidence indicates that a traffic stop has often been the occasion for an assault upon a police officer. According to one study, approximately 30 percent of the shootings of police officers occur in the course of an encounter resulting from stopping a person in an automobile. A. Bristow, "Police Officer Shootings—A Tactical Evaluation," 54 J. Crim. L. C. & P. S. 93 (1963); see *United States* v. *Robinson,* 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973).

of anyone whom a police officer is under a duty to take into his custody, regardless of whether the arrest is for a traffic offense or for some other crime. *United States* v. *Robinson,* supra. The search of the defendant's automobile was also permissible, whether or not there was probable cause to believe that it contained contraband, as the majority assumes, because it was made while the defendant remained at the scene under circumstances where it was reasonable for the arresting officer to remove a suspected threat to his own safety. *New York* v. *Belton,* supra.

Accordingly, I agree with the result.