******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., concurring in the judgment. I agree that the use of a dog sniff to detect contraband inside the condominium unit occupied by the defendant, Dennis Kono, violated his rights, but for reasons different from those given by the majority. The majority relies on our state constitution, but, in my view, looking to the state constitution is unnecessary when, as in the present case, existing federal constitutional doctrine favors the defendant. Instead, when a party raises a claim under both the federal and state constitutions, the proper mode of analysis should be to address the federal claim first, turning to the state constitutional claim only after determining that the federal constitution does not provide a basis for relief or if the applicable federal rule is truly unsettled. I therefore respectfully concur only in the judgment.

I

Turning to the federal constitutional question, I would first conclude that federal case law from the United States Court of Appeals for the Second Circuit resolves the federal constitutional claim before us. Three decades ago, in *United States* v. *Thomas*, 757 F.2d 1359, 1367 (2d Cir.), cert. denied sub nom. *Fisher* v. *United States*, 474 U.S. 819, 106 S. Ct. 66, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Wheelings* v. *United States*, 474 U.S. 819, 106 S. Ct. 67, 88 L. Ed. 2d 54 (1985), and cert. denied sub nom. *Rice* v. *United States*, 479 U.S. 818, 107 S. Ct. 78, 93 L. Ed. 2d 34 (1986), the Second Circuit concluded that a warrantless dog sniff of the contents of a home violates the resident's reasonable expectation of privacy, even if the resident lives in an apartment and the dog is outside of his apartment door in a shared hallway. The holding in *Thomas* remains good law; see, e.g., *United States* v. *Hayes*, 551 F.3d 138, 144 (2d Cir. 2008); and the facts of *Thomas* match the facts of the present case in every relevant respect.

As the majority explains, even though decisions of the Second Circuit do not bind this court, we accord them great weight on questions of federal law, including federal constitutional law, when the United States Supreme Court has not expressly resolved the issue before us. See, e.g., *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 783, 23 A.3d 1192 (2011) ("it is well settled that decisions of the Second Circuit, while not binding [on] this court, nevertheless carry particularly persuasive weight in the resolution of issues of federal law when the United States Supreme Court has not spoken on the point" [internal quotation marks omitted]). Deferring to the Second Circuit's decisions on matters of federal law promotes principles of comity and consistency in the application of federal law in this

state. See id., 784 (noting that it would be " 'bizarre' " for application of federal law to depend on whether case was brought in state or federal court); see also *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 475–76 n.11, 881 A.2d 259 (2005) (citing cases explaining reasons for our deference to Second Circuit).

I see no compelling reason to depart from the approach of the Second Circuit in the present case. Nothing has eroded the basis for its holding in *Thomas* since that case was decided. Although *Thomas* was decided more than thirty years ago and was originally met with criticism, the Second Circuit has more recently cited it with approval; *United States* v. *Hayes*, supra, 551 F.3d 143–44; and more recent United States Supreme Court decisions issued after *Thomas* have, in fact, bolstered its reasoning.[1] See, e.g., *Kyllo* v. *United States*, 533 U.S. 27, 34–35, 40, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); see also *Florida* v. *Jardines*, U.S. , 133 S. Ct. 1409, 1417–18, 185 L. Ed. 2d 495 (2013); *Florida* v. *Jardines*, supra, 1418 (Kagan, J., concurring). And, as the majority explains, the only circuit court to have addressed the question after *Kyllo* and *Jardines* were decided reached the same conclusion as the Second Circuit in *Thomas*. See *United States* v. *Whitaker*, 820 F.3d 849, 852–54 (7th Cir. 2016). To be sure, Justice Espinosa has raised significant distinctions between the issues decided by the United States Supreme Court in *Kyllo* and *Jardines*, and the precise issue raised in the present case.[2] But, in my view, these distinctions do not justify a departure from Second Circuit precedent, at least if we are applying federal law.[3]

I thus would begin with the federal constitutional analysis, apply the Second Circuit's decision in *Thomas*, and conclude that the dog sniff of the defendant's condominium unit in the present case was a search under the fourth amendment. Deciding otherwise would have the bizarre consequence of granting our citizens *less* protection under federal law in state courts than that provided under federal law in federal courts.

## II

Because we may resolve the present case in the defendant's favor under the federal constitution, I disagree with the majority's decision to sidestep the federal constitution and instead resolve this issue by creating new doctrine under the state constitution. Specifically, I disagree with the majority's assertion, which is made without citation to authority, that we should analyze a federal constitutional claim first only if we are "able to say with a high degree of confidence that the United States Supreme Court, if presented with the federal constitutional claim," would reach the same conclusion. Footnote 23 of the majority opinion. The ability to confidently forecast how the United States Supreme Court might decide a question has not, in prior decisions, been treated as a prerequisite to beginning with a federal

constitutional analysis. See generally, e.g., *Pham* v. *Starkowski*, 300 Conn. 412, 428–62, 16 A.3d 635 (2011); *State* v. *Jenkins*, 298 Conn. 209, 231–48, 3 A.3d 806 (2010). Indeed, we routinely decide federal constitutional questions without clear guidance from the United States Supreme Court when those federal claims are made without accompanying state constitutional claims. Consequently, in light of the Second Circuit's prior decision in *Thomas*, I do not view the relevant federal precedent to be so ambiguous as to require that we avoid a federal analysis in the first instance.

To be sure, if the federal rule were truly unsettled—perhaps if *neither* the United States Supreme Court *nor* the Second Circuit had addressed the question, and other federal courts were generally silent on the matter—I might agree with the majority's approach. In the present case, however, the Second Circuit has already spoken on the question before us, on at least two occasions, so its decision is already binding on federal law enforcement personnel and the federal district courts *in this state*.

In addition, resolving the case under the federal constitution is more consistent with the procedural history of this case. Throughout the proceedings, the parties have principally argued the case under the federal constitution. In the trial court, the defendant moved to suppress the evidence at issue first under the federal constitution and only added a claim under the state constitution as an alternative. The trial court decided the motion to suppress in the defendant's favor under the federal constitution and therefore found it unnecessary to address the claim under the state constitution, leaving us without any lower court ruling on the state constitution to consider. And, because the trial court based its decision on the federal constitution alone, the parties in their appeal to this court again focused their arguments on the federal constitution, presenting the state constitutional claim as an alternative ground for affirmance. Reaching the state constitutional issue in the present appeal is unnecessary.

Perhaps the majority is concerned that the United States Supreme Court might disagree with its conclusion, and thus wants to insulate our decision from further review and possible reversal. This reasoning has its proponents; see, e.g., W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 36; but it seems to me to be an insufficient reason to avoid applying the federal constitution when it is otherwise dispositive. If the United States Supreme Court ever does overrule *Thomas*, in either this case or another case, we could revisit the question under our state constitution *then*, when there is actually a principled need for doing so, and with the added benefit of being able to consider the United States Supreme Court's rationale as we consider the parameters of our own constitution. Indeed,

if the United States Supreme Court were to disagree with *Thomas*, the validity of the majority's state constitutional analysis will necessarily be called into question in any event, given that we consider federal law when interpreting our state constitution and our understanding of federal law would have been incorrect.[4] *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992) (federal precedent is used as persuasive tool when court construes state constitution); see also *State* v. *Skok*, 318 Conn. 699, 730–31, 122 A.3d 608 (2015) (*Zarella, J.*, concurring) (agreeing that federal precedent provides persuasive authority when court interprets provisions of state constitution, at least when such provisions are related to federal constitutional provisions).

### III

The majority's decision to look first to the state constitution—a view grounded, in my view, on a faulty premise—highlights an inconsistency in our case law about whether we should first look to the federal or the state constitution when claims under both are properly raised.[5]

Our prior cases, including many search and seizure cases, do not reflect a principled approach to this question. For example, this court has, on a few occasions, relied solely on the state constitution without any explanation of why it did not conduct any analysis under the federal constitution. See, e.g., *State* v. *Joyce*, 229 Conn. 10, 15, 639 A.2d 1007 (1994) (declining to reach federal constitutional claim because state constitution provided basis for relief). In one decision, we noted that we should *always* examine the state constitution first. *State* v. *Chapman*, 227 Conn. 616, 626 n.8, 632 A.2d 674 (1993), superseded, 229 Conn. 529, 643 A.2d 1213 (1994). But this court has hardly followed that advice in practice, and has often addressed federal claims first, turning to the state constitution only after concluding that the federal constitution did not provide a basis for relief. See, e.g., *State* v. *Jenkins*, supra, 298 Conn. 231–32, 259–61 (addressing claim regarding allegedly illegal search under federal constitution before turning to state constitutional analysis); *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, 283 Conn. 86, 92, 97–98, 925 A.2d 1071 (2007) (analyzing federal equal protection claim before turning to state constitutional claim); *State* v. *Ledbetter*, 275 Conn. 534, 559–60, 881 A.2d 290 (2005) (resolving federal constitutional claim concerning eyewitness identification before turning to claim under state constitution), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *Linares*, 232 Conn. 345, 354, 376, 655 A.2d 737 (1995) (addressing first amendment claim before addressing claims under analogous state constitutional provisions).

This waffling between deciding claims variously under the state or federal constitution, especially in the

area of search and seizure law, is not a practice that we should perpetuate—at the very least because it gives our constitutional jurisprudence the appearance of being unprincipled. I would take this opportunity to clarify our mode of analysis with respect to the order of our consideration of federal and state constitutional issues. In my view, when a party properly raises a claim under both a federal constitutional provision and a comparable state constitutional provision, the better practice is to first address the question under the federal constitution, turning to the state constitution only after concluding that the federal provision does not provide a basis for relief or if the interpretation of the federal provision is truly unsettled or ambiguous. Ultimately, the quality of our constitutional analysis is most critical in a given case, but there are several prudential reasons to prefer consideration of the federal constitution first.

### A

For one thing, looking to the federal constitution first is more consistent with the reality of existing legal doctrine concerning individual rights and with our understanding of the role of our state constitution, which recognizes that the federal constitution sets a national minimum for the protection of individual rights but leaves states to interpret their constitutions to provide greater protection.

Some commentators and courts recommend looking to the state constitution first when confronted with a claim under both the federal and state constitution—an approach commonly referred to as the primacy model. Under this approach, the state court looks first to its own state constitution, looking to the federal constitution only if the state constitution fails to provide a basis for relief. See, e.g., W. Horton, supra, p. 37; J. Landau, "Some Thoughts About State Constitutional Interpretation," 115 Penn. St. L. Rev. 837, 845–46 (2011); cf. H. Linde, "First Things First: Rediscovering the States' Bill of Rights," 9 U. Balt. L. Rev. 379, 387 (1980). Proponents argue that, in a federal system, the first referent of a state judge should be the state's own laws and constitution, not the laws of another government. See W. Horton, supra, p. 37.

But this approach is inconsistent with the plain reality that federal constitutional law now dominates the field of individual constitutional rights, even in state proceedings, at least since the United States Supreme Court had determined that most of the guarantees in the federal Bill of Rights apply to the states by virtue of the due process clause of the fourteenth amendment—a process often referred to as incorporation. See U.S. Const., amend. XIV, § 1 (prohibiting state governments from depriving "any person of life, liberty or property, without due process of law").

Before incorporation, state courts had no need to

look beyond their state constitution or to consider which constitution to apply in a given case, because the federal constitution did not apply to state proceedings. State and federal courts treated the federal constitution as applying only to the federal government, with limited exceptions for when the federal constitution explicitly restricted actions by a state government, such as the prohibition on passing an ex post facto law. U.S. Const., art. I, § 10, cl. 1. Thus, in *Barron* v. *Mayor & City Council*, 32 U.S. (7 Pet.) 243, 250, 8 L. Ed. 672 (1833), the court rejected a claim that the fifth amendment's takings clause applied to state legislation. Writing for the court, Chief Justice John Marshall explained: "The [federal] constitution was ordained and established by the people of the United States for themselves, for their own government, and not for the government of the individual states. Each state established a constitution for itself, and, in that constitution, provided such limitations and restrictions on the powers of its particular government as its judgment dictated." Id., 247. Because the amendments in the Bill of Rights "contain no expression indicating an intention to apply them to the state governments," the court concluded that it could not "so apply them." Id., 250.

Under this view, courts accepted that rights granted by states might vary from those granted under the federal constitution. As the court explained in *United States* v. *Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1875), "[w]e have in our political system a government of the United States and a government of each of the several [s]tates. Each one of these governments is distinct from the others, and each has citizens of its own who owe it allegiance, and whose rights, within its jurisdiction, it must protect. The same person may be at the same time a citizen of the United States and a citizen of a [s]tate, but his rights of citizenship under one of these governments will be different from those he has under the other." Id., 549.

Because the federal and state constitutions stood truly independent of one another, state courts looked to their own constitutions to determine the rights of individuals, and many states, including Connecticut, interpreted their state constitutions to provide less protection than the federal constitution. See, e.g., *State* v. *Michael J.*, 274 Conn. 321, 351, 875 A.2d 510 (2005) (noting that Connecticut constitution provided less protection against double jeopardy until United States Supreme Court applied fifth amendment guarantee against double jeopardy to states); *State* v. *Magnano*, 97 Conn. 543, 546, 117 A. 550 (1922) (declining to apply federal exclusionary rule in state proceeding because state constitution did not require exclusion of illegally obtained evidence, and federal constitution was not binding).

But this dichotomy between state and federal rights

began to erode as the United States Supreme Court recognized that certain protections in the federal Bill of Rights might be considered an integral part of the due process guaranteed to state citizens by the due process clause of the fourteenth amendment. The court did not incorporate the entire Bill of Rights at once but gradually incorporated many of its provisions on a case-by-case basis over a period of several decades. The process began with *Chicago, Burlington & Quincy Railroad Co.* v. *Chicago*, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897), in which the court concluded that "a judgment of a state court, even if it [is] authorized by statute, [pursuant to which] private property is taken for the [s]tate or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the [f]ourteenth [a]mendment of the [c]onstitution of the United States . . . ." Id., 241. And, in *Gitlow* v. *New York*, 268 U.S. 652, 45 S. Ct. 625, 69 L. Ed. 1138 (1925), the court concluded that certain first amendment protections also applied to state governments, explaining that, "freedom of speech and of the press—which are protected by the [f]irst [a]mendment from abridgment by Congress—are among the fundamental personal rights and liberties protected by the due process clause of the [f]ourteenth [a]mendment from impairment by the [s]tates." (Internal quotation marks omitted.) Id., 666.

The incorporation of constitutional rights through the due process clause of the fourteenth amendment progressed slowly thereafter, until the Warren Court[6] in the 1960s increased the pace substantially, particularly for amendments affecting the rights of the accused in a state criminal proceeding. See, e.g., *Benton* v. *Maryland*, 395 U.S. 784, 787, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969) (applying fifth amendment guarantee against double jeopardy to states); *Duncan* v. *Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968) (states must apply sixth amendment right to jury trial to state criminal trials); *Washington* v. *Texas*, 388 U.S. 14, 18–19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (sixth amendment guarantee of compulsory process to obtain favorable witnesses applies to states); *Klopfer* v. *North Carolina*, 386 U.S. 213, 222–23, 226, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967) (sixth amendment right to speedy trial applies to states); *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) (fifth amendment right against self-incrimination applies to states); *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (sixth amendment right of accused to confront witnesses applies to states); *Aguilar* v. *Texas*, 378 U.S. 108, 110, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964) (applying certain fourth amendment standards for obtaining warrant to states), overruled in part on other grounds by *Illinois* v. *Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *Gideon* v.

*Wainwright,* 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (sixth amendment right to appointed counsel for indigent defendants applies to states); *Robinson* v. *California,* 370 U.S. 660, 666–67, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) (states bound by eighth amendment protection from cruel and unusual punishments); *Mapp* v. *Ohio,* 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (applying fourth amendment exclusionary rule to state prosecutions).

The rapid progress of incorporation in the 1960s arose principally from the court's concerns over the fairness of criminal proceedings when states did not guarantee their citizens the same protections in state proceedings that their citizens already enjoyed in federal court. For example, before the decision in *Mapp,* the federal exclusionary rule did not apply in state prosecutions. See *Mapp* v. *Ohio,* supra, 367 U.S. 657–58. As a result, although the federal constitution barred federal prosecutors from using illegally obtained evidence, state prosecutors were free to use that same evidence in state prosecutions. See id., 658. This dichotomy encouraged federal law enforcement officers to turn evidence obtained illegally under federal law over to state authorities for their use in a state prosecution, a practice commonly known as the " 'silver platter' " doctrine. Id., 653; see id., 658. This practice substantially undermined the value of the fourth amendment's guarantee against unreasonable searches and seizures. See id., 658.

Concern for the undermining of federal constitutional protections led in significant part to the court's decision in *Mapp* to apply the fourth amendment exclusionary rule against the states, a decision that began the rapid acceleration of incorporation. In justifying its decision on practical grounds, the court observed that "a federal prosecutor [could] make no use of evidence illegally seized, but a [s]tate's attorney across the street could"; id., 657; such that "federal officers, being human, were . . . invited to and did . . . step across the street to the [s]tate's attorney with their unconstitutionally seized evidence." Id., 658. The court was concerned that, through this practice, "the [s]tate, by admitting evidence unlawfully seized, serve[d] to encourage disobedience to the [f]ederal [c]onstitution, which it is bound to uphold." Id., 657; see also W. Brennan, "The Bill of Rights and the States: The Revival of State Constitutions As Guardians of Individual Rights," 61 N.Y.U. L. Rev. 535, 541 (1986) ("[a] healthy federalism is not promoted by allowing state officers to seize evidence illegally or by permitting state courts to utilize such evidence" [emphasis omitted]).

The solution to this problem, the court explained, was uniformity between the limitations on federal and state authorities in criminal proceedings. According to the court, "[f]ederal-state cooperation in the solution of crime under constitutional standards will be pro-

moted, if only by recognition of their now mutual obligation to respect the same fundamental criteria in their approaches. . . . Denying shortcuts to only one of two cooperating law enforcement agencies tends naturally to breed legitimate suspicion of working arrangements whose results are equally tainted." (Citation omitted; internal quotation marks omitted.) *Mapp* v. *Ohio*, supra, 367 U.S. 658.

The incorporation surge of the 1960s forced state courts, for the first time, to consider the federal constitution in addition to any coordinate state constitutional provisions. Because many state constitutions had provided less protection than the federal constitution, litigants began to favor claims under the federal constitution, and the federal constitution took on a dominant role in the field of individual rights nationwide, especially the rights of criminal defendants. See, e.g., R. Range, note, "Reverse Silver Platter: Should Evidence That State Officials Obtained in Violation of a State Constitution Be Admissible in a Federal Criminal Trial?," 45 Wash. & Lee L. Rev. 1499, 1512 (1988) ("[b]ecause federal protection of individual rights greatly was expanding, state courts had little or no incentive independently to interpret state constitutions as providing greater protection than the federal constitution"). Instead of relying on a patchwork of state constitutions, state courts across the country were bound to apply much of the federal Bill of Rights in their proceedings, giving rise to a new, nationwide body of law. See W. Brennan, supra, 61 N.Y.U. L. Rev. 540 ("[i]n the years between 1961 and 1969, the [United States] Supreme Court interpreted the [f]ourteenth [a]mendment to nationalize civil rights, making the great guarantees of life, liberty, and property binding on all governments throughout the nation"). Prior decisions in Connecticut providing less protection under our state constitution were overruled. See, e.g., *State* v. *DelVecchio*, 149 Conn. 567, 572–73, 182 A.2d 402 (1962) (applying federal exclusionary rule after United States Supreme Court applied fourth amendment protections to states); see also *State* v. *Michael J.*, supra, 274 Conn. 351–52 (noting that Connecticut constitution provided less protection against double jeopardy until United States Supreme Court applied fifth amendment protections to states). Litigants and courts have since continued to overwhelmingly favor claims under the federal constitution, raising a state constitutional claim, if at all, as an alternative in case the federal claim fails. See, e.g., R. Williams, "State Constitutional Methodology in Search and Seizure Cases," 77 Miss. L.J. 225, 241 (2007); see also "Developments in the Law: The Interpretation of State Constitutional Rights," 95 Harv. L. Rev. 1324, 1357 (1982). Law schools principally teach federal constitutional rights, and commentators, judges, and lawyers today are far more familiar with the federal constitutional protections than those of the state consti-

tutions, which vary from state to state. The preference for the federal constitution demonstrated by the parties and the trial court in the present case illustrates the point.

To be sure, the rise of the federal constitution in state proceedings has not entirely sidelined state constitutions. During the 1970s, the United States Supreme Court adopted limitations and exceptions for many of the rights the court previously had expanded on and granted to state citizens in the 1960s. This curtailment led commentators and dissenting United States Supreme Court justices in the 1970s and 1980s to encourage state courts to reject that court's recent curtailments by finding greater protection for individual rights under state constitutions. See, e.g., R. Range, supra, 45 Wash. & Lee L. Rev. 1512–13; see also W. Brennan, supra, 61 N.Y.U. L. Rev. 548–50.

Although this call for action led to a reemergence of the state constitution as an independent source of rights; see R. Range, supra, 45 Wash. & Lee L. Rev. 1511–13; as a practical matter, the opportunity for the state constitution to have a truly dispositive impact has substantially narrowed. "Developments in the Law: The Interpretation of State Constitutional Rights," supra, 95 Harv. L. Rev. 1356 ("the preeminence and supremacy of federal constitutional interpretation narrow the field for state elaboration and shape the context in which state constitutional law must evolve"). The state constitution can now make a difference in the outcome of a case only if it provides *greater* protection than the federal constitution.[7] Indeed, our own cases recognize this more limited role of our state constitution. This court repeatedly has emphasized that the federal constitution sets "a minimum national standard for the exercise of individual rights" that states must guarantee but permits states to provide "higher levels of protection for such rights" under state law. (Internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 684; see also *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155–56, 957 A.2d 407 (2008); *State* v. *Ledbetter*, supra, 275 Conn. 560; *State* v. *Linares*, supra, 232 Conn. 378–79; *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, 229 Conn. 312, 316–17, 640 A.2d 101 (1994).

The primacy approach of putting the state constitution first stands in contrast to the primary position the federal constitution occupies in the field of individual rights, even in state proceedings, and thus assigns to the state constitution a role it no longer holds. See "Developments in the Law: The Interpretation of State Constitutional Rights," supra, 95 Harv. L. Rev. 1357 ("The failing of the primacy model is that this assumption no longer resembles reality. Nor does it reflect the fact that litigants typically present state constitutional issues only when they expect an unfavorable federal constitutional result. Federal assumption of the domi-

nant role in the federal system—and particularly in the protection of individual rights—has rendered the primacy model obsolete." [Footnote omitted.]). Instead, "[f]or state constitutional law to assume a realistic role, state courts must acknowledge the dominance of federal law and focus directly on the [gap filling] potential of state constitutions." Id.

B

Given the respective roles of the federal and state constitutions following incorporation, I believe the better approach is one that resolves claims under the federal constitution first, and that looks to the state constitution when the federal constitution fails to provide the protections sought. This method—commonly called an interstitial approach—recognizes that the federal constitution sets minimum protections and calls for application of the state constitution only when necessary to supplement the protections of the federal constitution if the state might provide greater protection. See, e.g., M. Kelman, "Foreword: Rediscovering the State Constitutional Bill of Rights," 27 Wayne L. Rev. 413, 429–31 (1981); J. Landau, supra, 115 Penn. St. L. Rev. 846; "Developments in the Law: The Interpretation of State Constitutional Rights," supra, 95 Harv. L. Rev. 1356–57.

Federal law marks a natural starting point for any claim made under both the federal and state constitutions. In most cases, the federal rule will be readily ascertainable. Because litigants have strongly favored federal claims, courts across the country apply the federal constitution and do so more often than we apply our own state constitution. This has created an "expansive body of federal law" far more developed than state constitutional law on an overlapping topic. "Developments in the Law: The Interpretation of State Constitutional Rights," supra, 95 Harv. L. Rev. 1357 (state constitutions are better served when performing gap filling role in light of extensive number of federal decisions already covering much of field).

Starting with the federal constitution better allows us to articulate differences between the federal and state constitutions when they exist. When the state constitution provides protection not afforded by the federal constitution, certainly, we have a duty to enforce the state constitution. See, e.g., *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988). But deciding a claim under the state constitution without first articulating the result under the federal constitution can leave ambiguity about whether and to what extent our constitution actually differs from the federal constitution. One commentator has explained that, "[w]hen state judges pass over a fairly arguable federal issue . . . we do not know whether the decision upholding the claim of state constitutional rights is a genuinely differentiated act of state interpretation or a crypto-federal ruling." M. Kelman,

supra, 27 Wayne L. Rev. 430. Instead, the better practice is to declare the scope of the federal constitution before embarking on a state constitutional analysis. Doing so clearly delineates the differences between the two constitutions. Indeed, "[b]y proceeding from a failed federal claim to the question [of] whether the state constitution grants broader rights in the circumstances of the case, the state court eliminates an ambiguity that otherwise might shroud its decision. It tells us distinctly, and obliges the court to think more carefully about, whether and why the state constitution differs from or retains the same meaning as the federally interpreted counterpart." Id., 429. It also helps to avoid the appearance that the state constitutional analysis is merely a result oriented rejection of the federal rule rather than truly an independent and principled interpretation of our state charter. See id., 430–31 ("[t]he more credible separation of the state from the federal interpretation is that which takes place in the first place by a clear cut disposition of the [federal] issue followed by the state constitutional pronouncement").

Moreover, analyzing a claim first under the federal constitution coincides with our mode of state constitutional interpretation, which requires us to consider federal law on the topic in any event. Federal constitutional jurisprudence, although not binding, provides persuasive authority for any interpretation or application of an analogous provision of our state constitution. See, e.g., *State* v. *Linares*, supra, 232 Conn. 378–79. Indeed, we use federal precedent as one of six interpretive tools when construing our constitution, at least when our state constitution has a federal analog. See, e.g., *State* v. *Geisler*, supra, 222 Conn. 685; see also *State* v. *Skok*, supra, 318 Conn. 729–31 (*Zarella, J.*, concurring). If, after reviewing federal case law in the context of a state constitutional analysis, it becomes apparent that the federal constitution would provide relief, there is no practical need for continuing with a needless state constitutional disquisition.

Beginning with the federal constitution also helps to avoid unnecessary constitutional decision making. If the federal constitution provides relief in a given case, we have no need to consider the question separately under the state constitution. As a matter of judicial restraint, we commonly avoid addressing constitutional questions that are not necessary to our disposition. See, e.g., *State* v. *Cofield*, 220 Conn. 38, 49–50, 595 A.2d 1349 (1991) (declining to consider whether recent United States Supreme Court decision also applied under state constitution when existing federal constitutional law was dispositive). If the federal constitution affords relief, we should not conduct an unnecessary state constitutional analysis, especially when, as in the present case, doing so requires us to needlessly create new doctrine. See "Developments in the Law: The Interpretation of State Constitutional Rights," supra, 95 Harv. L.

Rev. 1357–58 ("This interstitial role recognizes federal doctrine as a settled floor of rights and asks whether and how to criticize, amplify, or supplement this doctrine to yield more extensive constitutional protections. *The state court's role is not to construct a complete system of fundamental rights from the ground up*." [Emphasis added; footnote omitted.]); see also M. Kelman, supra, 27 Wayne L. Rev. 429 ("a separation of the state issue from the federal need not occur until the individual rights claim has been considered and rejected on its federal merits").

Finally, looking to the federal constitution first will help to avoid creating unnecessary or unintended differences between federal law and state law. We should favor uniformity between the two constitutions when federal law is adequate to protect the rights of a party in a given case. As the decision in *Mapp* v. *Ohio*, supra, 367 U.S. 643, demonstrates, deviations between federal and state law can ultimately undermine our constitutional order, especially in the area of search and seizure jurisprudence. Divergent search and seizure principles encourage the criminal law equivalent of forum shopping, at least for crimes that might also be prosecuted under federal law.[8] Because our state constitution does not bind federal authorities or federal courts; see, e.g., *United States* v. *Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987); we are powerless to prevent state authorities who have obtained evidence in violation of the state constitution from providing it to federal authorities for their use in a federal prosecution, undermining both the legitimacy and value of protections granted by our state constitution. See, e.g., R. Range, supra, 45 Wash. & Lee L. Rev. 1499. Indeed, the Second Circuit has made clear that federal district courts may admit evidence even if seized in violation of a state constitution. *United States* v. *Pforzheimer*, supra, 204. It was precisely this type of practice that led the United States Supreme Court to hasten its incorporation process in the 1960s as a means of creating uniformity between federal and state law. See R. Range, supra, 1500–1501; cf. *Mapp* v. *Ohio*, supra, 657–58. Resorting to the state constitution only when necessary to fill a gap left by the federal constitution will help reduce the opportunity for similar problems to arise from our state constitutional interpretation.

For the foregoing reasons, I would simplify our decision and decide it under the federal constitution, consistent with the Second Circuit's decision in *Thomas*. Because the majority has unnecessarily opted to resolve the case under our state constitution without first resolving the federal constitutional claim, I concur in the judgment only.

[1] The majority implies that *Thomas* does less to settle the fourth amendment question before us because *Thomas* was decided "many years before the seminal cases of [*Florida* v. *Jardines*,     U.S.     , 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013), *Illinois* v. *Caballes*, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), and *Kyllo* v. *United States*, 533 U.S. 27, 121 S. Ct. 2038,

150 L. Ed. 2d 94 (2001)] were decided . . . ." This implication, however, is contradicted by the majority's own recognition that "*Kyllo* and *Jardines* tend to favor the defendant's position" and that the decision in *Caballes* has been distinguished because it involved the search of a motor vehicle, which traditionally receives less protection under the fourth amendment than a person's home.

[2] Whether I would agree with Justice Espinosa's position under the state constitution is another matter, and one that I need not address in view of my reliance on the federal constitution.

[3] The majority cites a number of decisions that originally criticized the decision in *Thomas*, but the criticism in those cases does not convince me to depart from that decision. Most significantly, each of these cases criticizing *Thomas* was decided before *Jardines*, and many were decided even before *Kyllo*. It is questionable whether, in light of *Jardines*, these courts would maintain their original criticism. For example, the Eighth Circuit concluded, before *Jardines*, that dog sniffs at apartment doors are not searches. *United States* v. *Scott*, 610 F.3d 1009, 1015 (8th Cir. 2010), cert. denied, 562 U.S. 1160, 131 S. Ct. 964, 178 L. Ed. 2d 794 (2011). But at least one District Court in that circuit has concluded that the Eighth Circuit's decision in *Scott* is no longer good law after *Jardines*. See, e.g., *United States* v. *Hopkins*, United States District Court, Docket No. CR14-0120 (N.D. Iowa July 6, 2015) (concluding that, although, "prior to *Jardines*, officers could rely on Eighth Circuit precedent in conducting dog sniffs outside the doorways of residences in an apartment complex," these dog sniffs were now searches under fourth amendment).

[4] Thus, beginning with a federal constitutional analysis makes sense as a practical matter because any interpretation of our state constitution requires that we analyze the meaning of federal law in any event. See *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). If, in analyzing federal law for the purpose of interpreting the state constitution, this court determines that federal law supports the relief being sought, there is little reason to continue with a state constitutional analysis.

[5] Of course, this question does not arise when a party has made a claim under only the state constitution, which typically happens when the federal constitution clearly does not provide a basis for relief or when a party is seeking greater protection under the state constitution. See, e.g., *State* v. *Skok*, supra, 318 Conn. 701 and n.3; *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 402–403, 119 A.3d 462 (2015); *State* v. *Kelly*, 313 Conn. 1, 12, 95 A.3d 1081 (2014); *State* v. *Williams*, 311 Conn. 626, 628–29, 88 A.3d 534 (2014); *State* v. *DeFusco*, 224 Conn. 627, 631–32, 620 A.2d 746 (1993); *State* v. *Marsala*, 216 Conn. 150, 159–61, 579 A.2d 58 (1990); *State* v. *Dukes*, 209 Conn. 98, 100 and n.4, 547 A.2d 10 (1988).

[6] The "Warren Court" signifies the group of judges that comprised the United States Supreme Court when Earl Warren served as Chief Justice.

[7] Of course, state constitutions continue to apply exclusively in matters not addressed by the federal constitution and for those federal guarantees that the United States Supreme Court has applied to the states through the incorporation doctrine.

[8] We should interpret our constitution differently from the federal constitution only when necessary to protect the rights of our citizens; otherwise, we risk unnecessarily encouraging a "reverse silver platter" problem—essentially the mirror image of the problem identified in *Mapp*. See R. Range, supra, 45 Wash. & Lee L. Rev. 1499 (discussing "reverse silver platter" practice that arises when federal officials may use evidence inadmissible in state court). Whenever we interpret our state constitution to forbid the use of evidence that would be allowed in federal court under the federal constitution, we risk encouraging state law enforcement officials to turn evidence not permitted in a state proceeding over to federal authorities for use in a federal proceeding.